RECORD NO. 14-2168

In The

# United States Court Of Appeals
## For The Fourth Circuit

## DAVID CHRISTIAN, III,

*Plaintiff – Appellant,*

v.

## SOUTH CAROLINA DEPARTMENT OF LABOR, LICENSING AND REGULATION; CATHERINE TEMPLETON; SAMUEL WILKINS; WILLIAM COOK, a/k/a Ron; CHARLES IDO; HOLBROOK ALVEY, a/k/a Rion, in their official and individual capacities,

*Defendants – Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AT COLUMBIA

——————————

## BRIEF OF APPELLEES

——————————

Jonathan P. Pearson
FISHER & PHILLIPS LLP
P.O. Box 11612
Columbia, S.C. 29211
(803) 255-0000

*Counsel for Defendant-Appellee*
*South Carolina Department of*
*Labor, Licensing and Regulation*

Kenneth P. Woodington
Daniel C. Plyler
DAVIDSON & LINDEMANN, P.A.
P.O. Box 8568
Columbia, SC 29202
(803) 806-8222

*Counsel for Defendant-Appellee*
*Holbrook Alvey, a/ka/ Rion*

Eugene H. Matthews
RICHARDSON PLOWDEN
& ROBINSON, P.A.
P.O. Box 7788
Columbia, SC 29202
(803) 771-0016

*Counsel for Defendant-Appellee*
*Samuel Wilkins*

Damon C. Wlodarczyk
RILEY POPE & LANEY, LLC
P.O. Box 11412
Columbia, SC 29211
(803) 799-9993

*Counsel for Defendant-Appellee*
*William Cook, a/k/a Ron*

Mary Agnes (Molly) Hood Craig
Brian Edward Johnson
HOOD LAW FIRM
P.O. Box 1508
Charleston, SC 29402
(843) 577-4435

*Counsel for Defendant-Appellee*
*Catherine Templeton*

Katherine Anne Phillips
MALONE, THOMPSON,
SUMMERS & OTT, LLC
339 Heyward Street, Suite 200
Columbia, SC 29201
(803) 254-3300

*Counsel for Defendant-Appellee*
*Charles Ido*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-2168__        Caption: __Christian v. SC Department of Labor, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__SC Department of Labor, et al.__
(name of party/amicus)

_____

who is _____Appellees_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                   ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Jonathan P. Pearson          Date:    May 4, 2015

Counsel for: Appellees

## CERTIFICATE OF SERVICE
****************************

I certify that on _____May 4, 2015_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Jonathan P. Pearson                              May 4, 2015
            (signature)                                        (date)

- 2 -

**<u>TABLE OF CONTENTS</u>**

**Page**

TABLE OF AUTHORITIES ................................................................iv

I.   STATEMENT OF THE ISSUES ................................................1

II.  STATEMENT OF THE CASE ..................................................2

    A.   Relevant Facts ............................................................2

        1.   General Background................................................2

            (a).   LLR ..................................................................2

            (b).   Widespread Criticism of OLC ........................................3

            (c).   Leadership Changes and Reorganization at LLR ..........5

            (d).   Templeton Assesses The OLC Situation.........................6

            (e).   The OLC Reduction-In-Force ......................................10

            (f).   Other Reorganization RIFs in 2011...............................12

            (g).   Plaintiff's Applications for Other Jobs..........................13

        2.   The Individual Defendants ....................................16

            (a).   Catherine Templeton ....................................16

            (b).   Defendant Samuel Wilkins...............................16

            (c).   William "Ron" Cook ....................................17

            (d).   Charles Ido................................................19

            (e).   Holbrook "Rion" Alvey ...........................................20

        3.   Procedural History ................................................20

i

III.    SUMMARY OF ARGUMENT ................................................................23

IV.    ARGUMENT ..................................................................................25

    A.    Plaintiff's Claims Regarding the RIF ...................................................25

        1.    Plaintiff Has Not Presented Admissible Evidence of Discrimination Sufficient to Survive Summary Judgment .......25

    B.    Plaintiff's "Circumstantial Evidence" ...................................................27

        1.    The Reassignment of OLC Functions ...................................27

        2.    The RIF Procedure ................................................................28

        3.    Statistics ................................................................................31

        4.    Allegations Regarding Non-Minority Employees .................32

        5.    Ron Cook ..............................................................................34

        6.    Miscellaneous Allegations ...................................................36

            (a).    Templeton's Visit to State Officials .........................36

            (b).    Rumor Reported by Bailey-Glover ..........................36

            (c).    Unsupported Opinions of Youmans .........................37

            (d).    The "Anonymous" Letter ..........................................38

    C.    Plaintiff's Failure to Promote Claim ...................................................39

    D.    The District Court Correctly Dismissed Plaintiff's Conspiracy Claims ................................................................................................42

        1.    Background ...........................................................................42

        2.    Plaintiff's Civil Conspiracy Claim is Based on the Same Facts as His Other Claims ...................................................43

        3.    Plaintiff Has Not Pled or Proven Special Damages .................44

4.    The Individual Defendants' Actions Were Taken in the Scope of Their Official Duties, Which Rendered Those Defendants Statutorily Immune From Suit ............................... 46

5.    Plaintiff Has Not Shown That the Primary Purpose of the OLC RIF Was To Injure Him .................................................... 50

V.    CONCLUSION .............................................................................. 52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Bennett v SC Dept. of Corrections*,
    305 S.C. 310, 408 S.E.2d 230 (1991) ...........................................................29

*Birkbeck v. Marvel Lighting Corp.*,
    30 F.3d 507 (4th Cir. 1994) ......................................................................30

*Brinkley v. Harbour Rec. Club*,
    180 F.3d 598 (4th Cir. 1999) ...................................................................35

*Causey v. Balog*,
    162 F.3d 795 (4th Cir. 1998) ...................................................................26

*Cray Communications v. Novatel Computer Sys.*,
    33 F.3d 390 (4th Cir. 1994) ......................................................................45

*Cricket Cove Ventures, LLC v. Gilland*,
    390 S.C. 312, 701 S.E.2d 39 (Ct. App. 2010) .......................................42, 43

*DeJarnette v. Corning, Inc.*,
    133 F.3d 293 (4th Cir. 1998) ...................................................................28

*Diamond v. Colonial Life and Accident Ins. Co.*,
    416 F.3d 310 (4th Cir. 2005) ................................................................25, 32

*Dugan v. Albemarle County Sch. Bd.*,
    293 F.3d 716 (4th Cir. 2002) ...................................................................30

*Evans v. Technologies Applications & Serv. Co.*,
    80 F.3d 954 (4th Cir. 1996) ...........................................................26, 39, 40

*Figures v. Board of Pub. Utils.*,
    967 F.2d 357 (10th Cir. 1992) .................................................................35

*Goldberg v. B. Green & Co.*,
    836 F.2d 845 (4th Cir. 1988) ...................................................................40

iv

*Hackworth v. Greywood at Hammett, LLC*,
385 S.C. 110, 682 S.E.2d (Ct. App. 2009) ...............................................44, 45

*Hawkins v. PepsiCo, Inc.*,
203 F.3d 274 (4th Cir. 2000) .................................................................28

*Henson v. Liggett Group, Inc.*,
61 F.3d 270 (4th Cir. 1995) ..............................................................28, 32

*Hill v. Lockheed Martin Logistics Mgmt.*,
354 F.3d 277 (4th Cir. 2004) ............................................................25, 36

*Hux v. City of Newport News*,
451 F.3d 311 (4th Cir. 2006) .................................................................39

*Inheritance Funding Co. v. Chatman*,
2013 WL 3946237 (2013) .......................................................................49

*Jiminez v. Mary Washington College*,
57 F.3d 369 (4th Cir. 1995), *cert. denied*,
516 U.S. 944 (1995) ........................................................................28, 41

*Kennedy v. Landon*,
598 F.2d 337 (4th Cir. 1979) .................................................................41

*Kuznik v. Bees Ferry Assocs.*,
538 S.E.2d 15 (Ct. App. 2000) ...............................................................43

*Lamb v. Boeing Co.*,
213 Fed. Appx. 180 (4th Cir. 2007) .........................................................39

*Lee v. Chesterfield General Hospital, Inc.*,
289 S.C. 6, 344 S.E.2d 379 (Ct. App. 1986) .............................................42

*Mackey v. Shalala*,
360 F.3d 463 (4th Cir. 2004) .................................................................41

*McNaughton v. Charleston Charter School for Math and Science, Inc.*,
768 S.E.2d 389 (2015) .........................................................................45

*Merrick v. Farmers Ins. Group*,
892 F.2d 1434 (9th Cir. 1990) ........................................................ 35

*Mitchell v. Toledo Hosp.*,
964 F.2d 577 (6th Cir. 1992) ........................................................26

*Moore v. Charlotte*,
754 F.2d 1100 (4th Cir. 1985) ......................................................41

*O'Connor v. Consolidated Coin Caterers Corp.*,
56 F.3d 542 (4th Cir. 1995), *reversed on other grounds*,
517 U.S. 308 (1996) ........................................................................ 35

*Perry v. State Law Enforcement Div.*,
310 S.C. 558, 426 S.E.2d 334 (Ct. App. 1992) ............................29

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989) ...................................................................... 36

*Pye v. Estate of Fox*,
369 S.C. 555, 633 S.E.2d 505 (2006) ...........................................49

*Rand v. CF Indus.*,
42 F.3d 1139 (7th Cir. 1994) ........................................................26

*Smith v. Flax,*
618 F.2d 1062 (4th Cir. 1980) ......................................................40

*Stone v. Liberty Mut. Ins. Co.*,
105 F.3d 188 (4th Cir. 1997) ........................................................26

*Todd v. South Carolina Farm Bureau Mut. Ins. Co.*,
278 S.E.2d 607 (1981) .................................................................. 43

*United States v. Bales*,
813 F.2d 1289 (4th Cir.1987) .......................................................45

*Vaught v. Waites,*
    300 S.C. 201, 387 S.E.2d 91 (Ct. App. 1989)....................................42, 44

*Ware v. Potter,*
    106 Fed. Appx. 829 (4th Cir. 2004) ............................................... 39

**Statutes:**

42 U.S.C. § 1983 .....................................................................................21, 22

42 U.S.C. § 1985 .....................................................................................21, 22

42 U.S.C. § 2000(e) *et seq.*.......................................................................*passim*

S.C. Code Ann. § 8-11-230.......................................................................49

**Rules:**

Fed. R. Civ. P. 56 ....................................................................................25

Fed. R. Civ. P. 56(e)................................................................................26

**Regulation:**

S.C. Reg. §§ 19-701 to 19-720 .................................................................16

**Other Authorities:**

S.C. 2014-2015 Appropriation Bill,
Act No. 286, H. 4701, Proviso 117.92 (eff. July 1, 2014) ..................46

S.C. Appropriations Act, Proviso 89.146 (2010-11) ........................46
    Proviso 89.118 (2011-12) ...................................................46
    Proviso 89.103 (2012-13) ...................................................46
    Proviso 117.95 ...................................................................46

# I.  <u>STATEMENT OF THE ISSUES</u>

Appellees LLR and individual Defendants state the following issues presented for review in this appeal:

I.      Did the District Court correctly dismiss Plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* ("Title VII") where there was no evidence, circumstantial or otherwise, demonstrating discrimination or pretext in the employment actions complained of by Plaintiff?

II.     Did the District Court correctly dismiss Plaintiff's claim of civil conspiracy with the respect to individual Defendants Templeton, Wilkins, Cook, Ido, and Alvey where Plaintiff did not present evidence of the elements of a state civil conspiracy claim?

## II. <u>STATEMENT OF THE CASE</u>

### A. <u>Relevant Facts</u>

#### 1. General Background

Plaintiff, David Christian, III ("Plaintiff" or "Christian") was the Assistant Deputy Director ("ADD") for the Office of Licensure and Compliance ("OLC"), a division of the Department of Labor, Licensing and Regulation ("LLR") until April 2011.  In early 2011, a new Director, Catherine Templeton, was appointed to LLR and implemented a number of organizational changes in the Agency.  Plaintiff's job, along with the entire division of OLC, was eliminated in a reduction-in-force ("RIF") effective April 1, 2011.  As a result, Plaintiff was offered and accepted a position which paid a significantly lower salary.

#### (a). LLR

Defendant, South Carolina Department of Labor, Licensing and Regulation ("LLR") administers state programs related to health, safety and the regulation and licensing of professions and occupations.  The Director of LLR is appointed by the Governor.   This case involves the division of Professional and Occupational Licensing ("POL").  POL provides administrative services for 40 professional and occupational Boards and Commissions.  (JA 312).  These services include basic administrative support, investigations and issuing and revoking licenses.  (*Id.*)  While the Boards and Commissions themselves usually

consist of appointed members, all administrative support for the Boards are provided by LLR through POL.  (JA 1188).

At times relevant to this lawsuit in early 2011, POL was divided into three offices:  Office of Licensure and Compliance ("OLC"), Office of Investigations and Enforcement ("OIE"), and Office of Board Services ("OBS").  (JA 312).  OLC processed license applications and renewals for all boards.  It also monitored compliance with Board orders.  (JA 586-587).  For this reason, OLC was the office with the most public interaction.

OIE was responsible for investigating complaints about misconduct of licensees.  OBS was responsible for providing direct staff support to the individual boards and commissions, such as scheduling, staffing, and preparing for board meetings.  OBS also retained the licensing process for several boards.  (JA 372-373).

**(b).  Widespread Criticism of OLC**

OLC was created in 2008, when then-Director Adrienne Youmans reorganized the POL Division.  (JA 1186).  Youmans appointed Plaintiff to be Assistant Deputy Director over OLC.  (JA 1196).

The formation of OLC was controversial and was opposed by both LLR employees and professional and occupational licensing board members.  (JA 1190-1191; JA 1193-1195).  For instance, some board members allegedly

3

complained that they were not properly consulted about OLC's creation, including consultation on the reassignment of personnel to OLC. (JA 1198-1199). According to Youmans, many LLR employees also complained to her directly about being assigned to OLC. (JA 1215-1216). Youmans also recalled that some LLR employees left the Agency rather than be assigned to OLC. (JA 1216-1217).

There were also bitter disputes between OLC and some of the Boards, notably Accountancy and Pharmacy, involving the competence, credibility and authority of OLC. In fact, the Pharmacy Board obtained an opinion from the Attorney General stating that the Board, not OLC, had authority to issue its licenses. (JA 1233-1234; JA 666-667).

OLC was also the subject of many critics outside of LLR. By letter dated June 15, 2010, twenty-seven (27) legislators of the South Carolina General Assembly requested that the Legislative Audit Council ("LAC") conduct a review of OLC. (JA 236-241). The letter was authored by Representative William E. Sandifer, III, and stated that "[s]ince the formation of the OLC, issues and complaints regarding licensing renewals have allegedly increased rather than decreased." (JA 237).

Following receipt of this letter, LAC conducted an audit of OLC, which it completed and published in July 2011.[1]  (JA 306-343).  The audit reported that almost all of the POL management staff outside of OLC and the board administrators "expressed displeasure in the fashion that OLC was implemented and presented to the Agency" and "shared frustration with the poor quality of service that the licensing applicants received."  (JA 331-332).  The complaints to the General Assembly reached the point that several members proposed removing some of the boards and commissions, such as medical, pharmacy and real estate, from LLR.  (JA 926-928; JA 930-933).

### (c).  Leadership Changes and Reorganization at LLR

In November of 2010, in the midst of the controversy generated by OLC, Nikki Haley was elected Governor of the State of South Carolina.  After her election, she began to appoint new cabinet officials.  Governor Haley selected Catherine Templeton to replace Adrienne Youmans as Director of LLR.  (JA 959).

In January of 2011, Catherine Templeton was confirmed as the new director of LLR.  She faced many challenges.  (JA 963).  The Governor was specifically concerned about unnecessary delays in licensing.  (*Id.*).  While Defendant

---

[1] Although the formal report was issued after the OLC RIF, the investigation began in late 2010.  The conclusions of the audit largely confirmed the reasons for the reorganization.

5

Templeton was being considered for Senate confirmation, she heard comments
about LLR such as the following, as paraphrased by her in her deposition:

> . . . applications are getting lost, people are having to
> drive to Columbia to walk in and give cash and expedite,
> and, you know, watch it go through. It's taking forever.
> You know, it's a mess over there. We can't get anybody
> to answer the phone. We can't get anybody to answer the
> questions. And, Catherine, if you can get this
> straightened up….

(JA 992).  The need to act was made clear:

> And in my confirmation hearing, it was, Catherine, you
> need to get this straightened up. If you can get this
> straightened up, then we will not introduce legislation to
> break LLR up.

(JA 992).

### (d).  Templeton Assesses The OLC Situation

When Defendant Templeton arrived, she conducted a series of meetings and
requested information from OLC management, including Plaintiff, to try to
understand the problems.  (JA 1054-1055).  She quickly came to believe that the
very structure of OLC was the problem.  (JA 1016-1017).  Defendant Templeton
asked OLC management for information regarding how the licensing process
worked, but was not satisfied with the responses.  She stated:

> … When I got there, nobody could tell me how an
> application was processed or how long it took or what the
> process was to do it.

(JA 991).

6

As her inquiry into the operations of OLC continued, Defendant Templeton became convinced that the Agency and the regulated public would be better served if OLC was abolished.  Defendant Templeton stated her conclusion as follows:

> … In theory, colonizing the licensing function is not a bad idea.  But in practice, it was a horrible – a horrible failure and was probably, as it turned out we proved it to be, the reason that licensing was – had slowed down significantly – it wasn't happening at all.

(JA 983).

On January 20, 2011, only a week after her confirmation, Defendant Templeton met with Plaintiff, Defendant Alvey, and Randy Bryant with regard to the restructuring of the licensing function.  (JA 475).  At the time, Defendant Alvey was ADD for OIE and Bryant was ADD of OBS.  (JA 443-445).

At that first meeting, she made it clear that she was going to dismantle OLC.  (JA 475-476).  Bryant "gathered that she was going to disband OLC." (JA 569).  While it is unknown whether Plaintiff had the same understanding about the disbanding of OLC, he did understand, and indeed recommended, "that the boards take the initial licensing back."  (JA 700).  Plaintiff was well aware that Defendant Templeton intended to restructure the agency.  (JA 593).

In a January 21, 2011, email to Plaintiff, Defendant Alvey, and Bryant, Defendant Templeton stated as follows:

Randy, Rion, and David,

I want to be clear about our conversation yesterday. The three of you should be working together to come up with a process that is efficient and holds each area accountable for initial licensing. My idea is to move it back under each Board and to organize multiple boards under one set of "staff." I need to know:

What the appropriate, full complement would be for each Board Administrator. In other words, how many boards should each be assigned to ensure that everyone has a full work load, is cross trained on the Board for which they are responsible, and no one is overwhelmed unnecessarily during any period of time throughout the year. I recognize that some Administrators will have more Boards than others. Make this decision based on time, workload, similarity in function, etc.

*** 

Between the three of you, you should have the expertise and history to hammer this out with VERY little involvement from any other personnel. I do not want to worry any employees in any of the areas and I do not want you to discuss or detail where specific people should be assigned or even physically sit. The structure is all that I am concerned about.

(JA 249).

Defendant Templeton made it clear in her deposition that the restructuring of

the licensing and compliance functions consisted of two distinct decisions. The

first decision which involved the way Defendant Templeton "wanted the agency to

look" from a structural standpoint, involved Defendant Alvey, as well as Plaintiff

and Bryant. That decision also involved "a lot of input from the staff, front line

employees." (JA 1078-1080). She eventually decided that what "needed to be done for reorganization purposes was those employees that used to be under the board doing licensure and compliance functions needed to go back under the boards." (JA 989-990; JA 1074).

The second decision involved how the proposed reorganization would be implemented. In deciding how to implement the reorganization, Defendant Templeton consulted a different group of people. "[I]t was switched over to Lynn Rivers, Sam Wilkins, Heather Pope, and outside counsel." (JA 1080-1081). Defendant Alvey and Plaintiff were no longer involved in the decision-making process once the inquiry moved to the question of who would fill the available positions, what would happen to OLC staff, and related issues. Defendant Templeton had already asked Bryant to resign on February 2, 2011. (JA 1043). Defendant Alvey was promoted to Deputy Director over POL, which included OBS, OIE, and OLC.

As the reorganization took shape, the licensing functions would be performed by LLR employees assigned to work with specific boards and commissions under OBS. (JA 1024-1025; JA 1051). This would allow the LLR employees to become more knowledgeable about specific licensing requirements because they would only work for a limited number of boards and commissions. (JA 1035). This was the approach used before OLC was created. This reorganization would involve

eliminating OLC, "RIFing" all OLC employees, and offering most of them jobs performing similar functions in other areas of the Agency.

### (e).  The OLC Reduction-In-Force

Under LLR's Reduction-In-Force policy, LLR must select a "competitive area" for the RIF.  This is the area within which employees are selected for layoff. Employees within the competitive areas are ranked for layoff by "retention points" computed using various factors, including years of service and performance.  (JA 911-912).  Employees may "bump" or displace other employees within the competitive area if they are qualified to perform the job and have more retention points.  (JA 1112).  Employees may *not* displace employees outside the competitive areas.  Following the reduction-in-force, employees have recall rights to positions that come open within their competitive area.  They do not have preferential hiring rights for jobs that open elsewhere but, if they are rehired within twelve (12) months, they retain state seniority.  (JA 258-259).

The RIF plan designated OLC as the competitive area and eliminated the entire office.  A RIF plan was developed by LLR and approved by the Office of Human Resources of the Budget and Control Board.  (JA 1111).  The RIF plan addressing OLC included a total of sixty (60) employees.  After eliminating probationary and temporary employees and retired employees who had been rehired, forty-eight (48) OLC employees were involved in the layoff.  (JA 256).

LLR calculated retention points for the forty-eight (48) employees in order to select those persons who would be offered open administrative positions in OBS following the RIF. (JA 259). No employees were allowed to "bump" into other areas because that would be inconsistent with the Agency's RIF policy and State Regulations. (JA 1112-1114). However, all permanent employees of OLC, except four, were offered Administrative Assistant positions performing licensing or compliance functions with the various Boards. (JA 255-273). While Plaintiff and several other employees were offered jobs making less money, the majority of OLC employees took the new jobs making the same salary with no loss of seniority or benefits. (JA 673; JA 907).

State regulations require that demographic information on state agency RIFs, including the OLC RIF, be included in the RIF plan and made available to employees affected by the RIF.[2] (JA 906). Of the forty-eight (48) covered employees, in terms of race, twelve (12) were white, thirty-two (32) were African-American, and four (4) were "other." In terms of gender, six (6) were males, and forty-two (42) were females. In terms of age, thirty-five (35) were forty years old or older, and thirteen (13) were under forty. (JA 255-273).

---

[2] The two other RIFs conducted by LLR on the same date affected the OBS support section and LLR's Customer Call Center. All four persons terminated in the OBS RIF were white. Of the ten persons terminated in the Customer Care Center RIF, five were white and five were African American. (JA 629; JA 632).

The OLC RIF was announced on March 14, 2011.  Plaintiff and other LLR employees assigned to OLC received a letter announcing the reduction-in-force.  (JA 269-273).  Plaintiff, as well as other employees impacted by the reduction-in-force, were offered positions in OBS as Administrative Assistants in classification Band 4 at a salary of $31,843.  (JA 672).  This was a significant pay decrease for Plaintiff.  However, he retained his state seniority and benefits and was eligible to apply for other posted positions at LLR.  While Plaintiff's salary was decreased, the vast majority of the employees impacted by the reduction-in-force were in Band 4 or below and were not similarly impacted.  (JA 260-261; JA 630-631; JA 907).

Plaintiff, as a Program Manager II, was in Band 8.  The second highest compensated employee affected by the reduction-in-force was attorney Dwight Hayes who was a Band 7.  Hayes, who is white, was given no option but retirement.  Plaintiff ultimately accepted an assignment as an Administrative Assistant on the Nursing Board, but almost immediately went on an extended medical leave.

### (f).  Other Reorganization RIFs in 2011

While Plaintiff argues that the OLC RIF was a vast conspiracy designed to target him personally, the facts demonstrate otherwise.  Throughout 2011, LLR implemented no fewer than six (6) RIF plans affecting diverse elements of the

12

agency as a part of Templeton's plans to reorganize and restructure LLR. (JA 1057). The following offices were affected at LLR:

- January 20, 2011 – Director's Office/Office of Special Projects – 3 persons affected, including 1 covered employee.

- March 10, 2011 – POL/OLC – 63 persons affected, including 48 covered employees.

- March 10, 2011 – Director's Office/Office of Communications/Customer Care Center – 11 persons affected, including 10 covered employees.

- March 10, 2011 – POL/Office of Board Services/Support Services – 7 persons affected, including 6 covered employees.

- June 22, 2011 – Director's Office/Immigrant Worker Compliance Program – 4 persons affected, including 3 covered employees.

- August 15, 2011 – POL/OIE/Elevators & Amusement Rides – 4 persons affected including 1 covered employee.

(JA 1057-1061).

In each of these RIFs, including OLC, almost all permanent employees were rehired by the Agency.

### (g). Plaintiff's Applications for Other Jobs

Plaintiff applied for three jobs in March of 2011. He was interviewed for all three jobs by Rion Alvey, Deputy Director for POL, and Assistant General Counsel Lynne Rogers. Defendant Alvey is a white male. Rogers is an African-American female. (JA 604). Plaintiff was ranked by Defendant Alvey and Rogers

13

for each position.  Defendant Alvey rated Plaintiff a total of 34 points (out of 40) in the interview.  Lynne Rogers ranked him a total of 33 points.  Although Defendant Alvey and Rogers ranked Plaintiff differently, Plaintiff ranked below the successful applicants for each job.

One of these positions was an ADD over OBS.  OBS had been under federal investigation.  (JA 488; JA 982).  The OBS position was open because Randy Bryant, a white male, had been asked to retire by Defendant Templeton.  The Agency wanted an ADD who had investigation and management experience and who could work with law enforcement.  They were also looking for someone familiar with the subject area.  (JA 389).

The OBS job was awarded to Defendant Charles Ido.  Defendant Alvey gave Defendant Ido a total rating of 40 for the interview.  Lynne Rogers rated Defendant Ido with a total of 40 as well.  Defendant Ido had graduated from Florida State University in 1968 and worked as an Agent for the United States Secret Service for twenty (20) years.  Following that, he joined LLR (or its predecessor).  He spent fourteen (14) years as an Investigator and then spent another approximately seven (7) years as Chief of Investigations in OIE.  (JA 768-769).

The second opening was for an ADD in OIE.  This position was open because the incumbent, Defendant Alvey, had been promoted to Deputy Director.  This job had been temporarily filled by Mark Dorman for two years while Alvey

14

was on a temporary assignment. Dorman had done a good job. (JA 469-470). Lynne Rogers and Defendant Rion Alvey made the following determinations regarding Mark Dorman during the interview process:

> Dorman was ranked with a total rating of 40 by Lynne Rogers who stated:
>
>> Has over 30 years at LLR, has supervised investigations for all Boards, payment of wages – child labor.
>
> Defendant Alvey similarly ranked Dorman as a 40 and stated:
>
>> Mr. Dorman has all of the required training/experience/and skills. He has already acted as the ADD over OIE for two years when the former ADD was put on temporary assignment. Has 31 years of wages/child labor.

(JA 382-399).

The third job was an ADD position to supervise Inspectors in the Drug Diversion Program. The Drug Diversion Program was a program designed specifically to investigate healthcare professionals who divert lawful drugs to unlawful use. This program was being run by Defendant Cook. As part of a reorganization, all POL Inspectors were transferred from OBS to Defendant Cook's division. The job was upgraded to an Assistant Deputy Director position and posted. Defendant Cook, as well as others, applied for it. (JA 382-399).

The Drug Diversion job was awarded to Defendant Cook. Defendant Cook received a total of 40 points from Lynne Rogers. Similarly, Defendant Alvey ranked Defendant Cook with 40 points. Defendant Cook spent twenty-seven (27)

15

years with the South Carolina Law Enforcement Division. His roles included conducting investigations and managing other agents. At the time of his application, he had worked as a Chief Investigator for LLR since 2005. (JA 382-399).

Following his failure to obtain one of these jobs, Plaintiff did not apply for other openings. (JA 658-659). He resigned effective January 16, 2012. (JA 367-368).

## 2. The Individual Defendants

### (a). Catherine Templeton

Defendant Templeton's involvement in the facts of this case is detailed above. She was appointed by the Governor as Director of LLR and implemented an extensive reorganization of LLR, including the OLC RIF complained of.

### (b). Defendant Samuel Wilkins

Defendant Wilkins served as the State Human Resources Director ("SHRD") during the period relevant to this action. (JA 1086). SHRD is responsible for providing advice to state agencies concerning state personnel issues, and also has regulatory authority over the rules set forth in the State Human Resources Regulations, S.C. Reg. §§ 19-701 to 19-720. (JA 1086-1087). Plaintiff has acknowledged that Defendant Wilkins has a duty to advise those agencies who so request. (JA 640).

SHRD employees often act as consultants to advise state agencies on personnel matters. In the context of a RIF, a SHRD consultant may provide feedback to an agency as to whether the agency's proposed RIF plan meets the requirements of the agency's policies. (JA 865-866). Because SHRD is charged with providing both advisory and regulatory services to state agencies, if an agency submits a RIF plan to SHRD for review, the SHRD consultant who advised the agency on the plan would not also review the plan for "procedural correctness." In that case, another SHRD consultant would perform the review. (JA 1127).

Defendant Wilkins' involvement in the layoff consisted of meeting with Defendant Templeton regarding the appropriate way to structure a reduction-in-force under state policies in OLC and other areas of the Agency. (JA 1089-1091).

### (c). William "Ron" Cook

Defendant Cook had been employed by LLR since 2005, when he was hired as an investigator for the Real Estate Board. (JA 725). Defendant Cook was previously employed by the S.C. Alcoholic Beverage Control Board as well as the South Carolina Law Enforcement Division (SLED) where he retired as the Deputy Director for Protective Services. (JA 722-724). At the time of the allegations in Plaintiff's Complaint, Defendant Cook was classified as an Investigator III and assigned to OIE. (JA 732).

17

It is alleged, and accepted for purposes of summary judgment, that Defendant Cook made a racially offensive comment in relation to another LLR employee, Sherry Wilson. It is also alleged, and accepted for purposes of summary judgment, that Defendant Cook made statements to various people within LLR that he had a special relationship with Governor Haley because his wife babysat for the Haleys and that he had special influence with the Governor regarding what happened at LLR. Defendant Cook testified that neither prior to nor after the election did he have any type of special relationship with Governor Haley. Moreover, Defendant Cook testified that he had not had any contact with Governor Haley since the night she was elected Governor. (JA 735-741).

Regardless of what Defendant Cook might have said about a special relationship with the Governor, there is no evidence that Defendant Cook participated in any way in the decisions complained of in this case. (JA 733-734; JA 751; JA 1084). Further, even if Defendant Cook did state he had a special relationship with the Governor, whatever relationship he may have had did not prevent him from being RIFed himself in January of 2012.[3]

---

[3] In the first year of Defendant Templeton's administration, three Assistant Deputy Directors lost their jobs. Defendant Templeton asked Randy Bryant to resign. Plaintiff and Defendant Cook were RIFed. Bryant and Defendant Cook were white, Plaintiff was African-American. Only Plaintiff was given an opportunity to stay with the Agency, retain his state seniority and benefits, and bid on future jobs.

18

### (d).  Charles Ido

As of January 12, 2011, Defendant Ido had served as a Division Chief within OIE since 2004. (JA 769; JA 785).  On February 3, 2011, Bryant, ADD over OBS, retired.   (JA 574).  Defendant Alvey asked Defendant Ido to serve as interim ADD over OBS and to temporarily fill Bryant's position until LLR could select a permanent ADD. (JA 487-488; JA 770-772).   As noted above, after the permanent position was posted, Defendant Ido applied for the position and received the promotion.  (JA 773-774).

After the OLC RIF, Defendant Ido met with the OLC employees who had accepted new positions under OBS, as Defendant Alvey had instructed him to do, only the day before. (JA 279-281; JA 793-794).

Defendant Ido's status as a Defendant in this case has always been particularly puzzling.  There is no evidence linking Defendant Ido to any of the decisions made in this case.   The only thing Defendant Ido did was successfully apply for a job which Plaintiff did not get.   The uncontested evidence reveals that Defendant Ido did not even know of the OLC reduction-in-force until it was publicly announced.  (JA 774).  His only role afterwards was to meet with OLC employees who were being rehired and assist them in beginning their new jobs.

### (e). Holbrook "Rion" Alvey

Defendant Alvey was first hired by Defendant LLR in 1987 and has held a wide variety of positions in the intervening years. (JA 443). In 2005, he became the full-time Assistant Deputy Director of OIE, reporting to General Counsel Lynne Rogers. (JA 444).

Shortly after Defendant Templeton became Director, she appointed Defendant Alvey to the position of Deputy Director over POL. However, when Defendant Templeton was determining how to restructure the Agency, Defendant Alvey, along with Plaintiff and Bryant, were Assistant Deputy Directors. (JA 443-445).

Defendant Alvey's involvement in the reorganization was limited to meeting Defendant Templeton, along with Bryant and Plaintiff, to discuss reorganizing the functions of OLC.

### 3. Procedural History

Plaintiff filed a charge of race discrimination with the Equal Employment Opportunity Commission on June 28, 2011, alleging that LLR discriminated against him due to his race in conducting a layoff in April of 2011. Plaintiff received a Notice of Right to Sue from the South Carolina Human Affairs Commission on or about January 19, 2011, from the EEOC on or about April 9, 2012.

20

Plaintiff filed this action in the United States District Court for the District of South Carolina (District Court) on May 24, 2012, alleging causes of action against LLR for violations of Title VII and 42 U.S.C. § 1983. The Complaint also alleged causes of action against the individual Defendants, in their official capacities, for violations of 42 U.S.C. §§ 1983 and 1985, as well as a pendant claim for civil conspiracy.

Following the close of extensive discovery, LLR and each individual Defendant filed motions for summary judgment on December 17, 2013.[4] Plaintiff filed responses on March 25, 2014. LLR and the individual Defendants replied on or about April 9, 2014.

On August 8, 2014, Magistrate Judge Paige J. Gossett entered a Report and Recommendation recommending that Defendants' Motions for Summary Judgment be granted in their entirety. This recommendation found that summary judgment was appropriate as to Plaintiff's claim for race discrimination under Title VII because Plaintiff could not and did not present sufficient evidence of discrimination to raise an inference of discrimination. More specifically, the Magistrate Judge held that Plaintiff failed to show that any decision maker in the case was motivated by his race in taking actions to reorganize Defendant LLR in the spring of 2011. The Defendants produced overwhelming evidence of a

---

[4] The case against Defendant Rivers was voluntarily dismissed on December 6, 2012.

legitimate, nondiscriminatory reason for reorganizing Defendant LLR and Plaintiff showed no evidence of pretext.  Further, the Magistrate Judge held that Plaintiff had not exhausted his administrative remedies with respect to an allegation of "forced" retirement or resignation.[5]

The Magistrate Judge also found that neither Defendant LLR nor the individual Defendants in their official capacities could be sued under 42 U.S.C. §§ 1983 or 1985.[6]  Finally, it was recommended that the civil conspiracy claim be dismissed because:  (a) the Plaintiff relied on the identical evidence to support his race discrimination and failure to promote claims as he did for his claims of conspiracy; (b) there was no evidence of special damages presented; and (c) civil conspiracy claims against public officials for employment actions taken in the exercise of their official duties are barred by a specific Act of the South Carolina General Assembly.

United States District Judge Terry Wooten accepted the Magistrate Judge's Report and Recommendation on September 26, 2014.  This appeal followed.

---

[5] Plaintiff has not appealed the dismissal of his "forced" retirement or resignation allegation which he later characterized as "constructive discharge."
[6] Plaintiff has not appealed the dismissal of his claims under §§ 1983 and 1985.

### III.  SUMMARY OF ARGUMENT

Plaintiff, David Christian, III ("Plaintiff" or "Christian") was the Assistant Deputy Director for the Office of Licensure and Compliance ("OLC"), a division of the Department of Labor, Licensing and Regulation ("LLR") until April 2011. In early 2011, a new Director, Defendant Catherine Templeton, was appointed to LLR and implemented a number of organizational changes in the Agency. Plaintiff's job, along with the entire division of OLC, was eliminated in a reduction-in-force ("RIF") effective April 1, 2011.  As a result, Plaintiff was offered a position which paid a significantly lower salary.

Uncontested facts establish that OLC was a highly controversial office from the time of its formation in 2008 until it was eliminated in 2011.  Plaintiff Christian and Adrianne Youmans, the former LLR Director who formed OLC, believed that OLC was functioning properly.  However, there is no doubt that many people on the Professional and Occupational Boards, the General Assembly, and the regulated public questioned the competence and authority of OLC.  When Defendant Templeton began her tenure in 2011, she agreed and OLC was eliminated.

Plaintiff alleges that the new Director and others in the Agency conceived of and implemented the reduction-in-force of his division (which involved some sixty (60) people), as well as five other RIFS, as a subterfuge for removing him based on

his race.  Plaintiff argues the existence of a vast conspiracy to eliminate him from his leadership position due to his race.  He named the individual Defendants as conspirators, as well as numerous nonparties to this action:  Governor and Mr. Haley, Randy Bryant, former Assistant Deputy Director of the Office of Board Services (who was asked to resign before the OLC RIF), Representative William Sandifer, members of regulated Boards, and Commissions, and many others. Plaintiff describes the impact of the RIF on numerous other employees, both Caucasian and African-American, as merely "collateral damage."  Plaintiff also complains that he applied for three other positions within LLR shortly after being notified of the impending RIF and did not receive any one of them.

In analyzing the propriety of summary judgment in this case, it is important to put aside hearsay, rumors and suspicion and look for evidence of discrimination on the part of those who made the decisions in this case.  There is no evidence whatsoever that race, rather than the controversy surrounding OLC, motivated anyone to take the actions complained of.  There is also no evidence that the individual Defendants conspired to harm Plaintiff.  In the final analysis, Plaintiff was simply on the wrong side of a dispute over the best way to provide professional licensing and enforcement services to the public.

# IV.  ARGUMENT

## A.  Plaintiff's Claims Regarding the RIF

### 1.  Plaintiff Has Not Presented Admissible Evidence of Discrimination Sufficient to Survive Summary Judgment

Plaintiff confuses the holdings in *Diamond v. Colonial Life and Accident Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) and *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277 (4th Cir. 2004).  These cases discuss the circumstances under which direct or circumstantial evidence may be used to establish a mixed-motive case, and impose a "but for" burden on Defendants.  The appropriate analysis for this case is the burden shifting framework of *McDonnell Douglas* as it was applied in *Hill v. Lockheed Martin*.  Regardless of when circumstantial evidence is considered the requirements for such evidence are the same.  Plaintiff must present relevant, admissible evidence showing that he was a victim of intentional discrimination.

Plaintiff misunderstands the nature of circumstantial evidence.  Before evidence can be circumstantial, it must be relevant, admissible evidence. Circumstantial evidence does not include rumors, opinions, or hearsay. It does not include baseless characterizations of innocuous events.  It also must be relevant and have some probative value.

Rule 56 of the Federal Rules of Civil Procedure requires that motions for summary judgment be founded upon and/or opposed by evidence which would be

admissible in court. *E.g., Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *Causey v. Balog*, 162 F.3d 795, 805 (4th Cir. 1998) ("Rule 56(e) precludes consideration of materials not based on the affiant's firsthand knowledge."); *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997) ("A party 'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.'"); *Rand v. CF Indus.*, 42 F.3d 1139, 1146 (7th Cir. 1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors."); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) ("[r]umors, conclusory allegations and subjective beliefs which are wholly insufficient evidence to establish a claim of discrimination as a matter of law.")

Plaintiff argues that this Court should adopt a "mosaic theory of proof." (Appellant Brief at 24).  A review of the cases cited by Plaintiff reveals that the "mosaic approach" adds nothing to the traditional analysis of circumstantial evidence under *McDonnell Douglas*.  Plaintiff complains that Defendants attempt "to undercut each piece of evidence individually" and "ignore the cumulative effect of bits and pieces of evidence."  (Appellant Brief at 24).  Defendants are not asking the court to disregard relevant, admissible evidence or consider it in isolation.  Defendants are simply pointing out that each and every piece of

evidence put forward by the Plaintiff to support his claim is either inadmissible hearsay, irrelevant, or otherwise lacking in probative value.

## B. Plaintiff's "Circumstantial Evidence"

**1. The Reassignment of OLC Functions:** Plaintiff argues that there was no need to reorganize OLC.  He claims, therefore, that the elimination of OLC must have been for some evil purpose.  This argument completely misses the point. Plaintiff and Youmans believed that OLC was a good idea and that, if given time, it would have worked.  They blame all of the shortcomings of OLC on individuals in the regulated boards and commissions who resisted the concept of OLC.  The boards and commissions, and eventually the Legislature, came to believe that OLC usurped powers reserved to the boards and commissions by statute and actually did a much worse job of issuing licenses and monitoring compliance than was accomplished prior to the creation of OLC.

Plaintiff still wants to argue that OLC was the most efficient way to handle Licensing and Compliance.  As the Magistrate Judge held:

> It is undisputed that there was an enormous practical and political battle over whether OLC was the appropriate approach.  Plaintiff lost the battle when Templeton, as a new Director, decided to abolish OLC.  Reassigning the functions of OLC was one of several perfectly reasonable business-related alternatives available to her.

(JA 139).  Disagreeing with Plaintiff on the effectiveness of OLC does not constitute race discrimination.  The question is not whether the decision to

27

eliminate OLC was the correct one according to Plaintiff. There is much evidence indicating that OLC was not doing its job. However, even if the decision to abolish OLC was incorrect, this Court has long held that it will not second-guess business decisions absent some proof of discriminatory motive. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) ("[i]t is not [the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."); *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 277 (4th Cir. 1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including work place reorganization, as long as the employer does not [discriminate]."); *Jiminez v. Mary Washington College,* 57 F.3d 369, 383 (4th Cir. 1995) ("The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment."); *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[t]his court does not sit as a kind of superpersonnel department weighing the prudence of employment decisions made by firms charged with employment discrimination.")

   **2. The RIF Procedure:** Plaintiff continues to argue that the limitation of the "competitive area" in the reduction-in-force to OLC was not appropriate under

state policy.   Plaintiff raised this specific issue in a grievance filed after termination.  (JA 291-293).  Plaintiff's grievance of April 4, 2011, stated:

> All competitive groups should have been included or considered for both OLC and OBS as a series which included administrative classifications and program classifications.
>
> * * *
>
> The fact is competitive groups in OBS were not included in the RIF as they were in OLC nor was consideration given for salaries in the areas of personal qualities such as:  education, experience, longevity, and past salary history.

(JA 291-293).   The grievance was denied.   The Office of Human Resources specifically held that the decision to limit the competitive area to the Office of Licensure and Compliance was correct and proper.   (JA 295-298).   Plaintiff appealed this decision to the Administrative Law Court which confirmed the Agency's decision in an Order issued on March 28, 2012.  (JA 371-380).  Plaintiff did not appeal this decision.  For this reason, the propriety of limiting the layoff to OLC is an issue that has been litigated and is not subject to challenge by the parties in subsequent litigation.  *E.g. Bennett v SC Dept. of Corrections*, 305 S.C. 310, 408 S.E.2d 230 (1991); *Perry v. State Law Enforcement Div.*, 310 S.C. 558, 426 S.E.2d 334 (Ct. App. 1992).

Further, even if the RIF was improperly implemented, this Court has held that questions raised as to the implementation of a layoff do not raise an inference of discrimination absent evidence of racial animus:

> Even if there is evidence that the School Board erroneously or even purposely misapplied the RIF policy, it is not proof of unlawful discrimination. [Plaintiff's] assertions of discrimination in and of themselves are simply insufficient to counter unrebutted evidence of legitimate, nondiscriminatory reasons for an adverse employment action.

*Dugan v. Albemarle County Sch. Bd.*, 293 F.3d 716, 722 (4th Cir. 2002). In this case, Director Templeton decided to conduct the layoff in the manner that she felt was required by state regulations and Agency policy. (JA 1077). Both the form and substance of the RIF were litigated through the state administrative law courts and Plaintiff's arguments were rejected.

Plaintiff further argues that the entire OLC layoff was engineered to "destroy [him] personally." (JA 616; JA 623). This Court rejected a similar argument in *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507 (4th Cir. 1994) when it held that:

> [I]t would make little sense for Marvel to shut down an entire twelve person department – and contract out its business – simply to rid itself of that department's 62-year old supervisor.

30 F.3d at 512. In this case, it makes even less sense for LLR to totally reorganize the functions of OLC and conduct five other RIFs in 2011 simply to target Plaintiff.

**3. Statistics:** Plaintiff refers to the "statistics" of the OLC RIF as evidence of discrimination.  (Appellant Brief at 29-30).   The District Court properly disregarded the evidence as being irrelevant.   These statistics are nothing more than a statement of the racial composition of OLC.   None of the parties to this lawsuit have ever contested the fact that many African-Americans worked in OLC.

The "statistics" cited by Plaintiff are of no probative value in this case for several reasons:  First, the employees represented in these "statistics" were offered jobs in OBS.  The RIF Plan showed that thirty-five (35) employees were offered new positions following the RIF.  (JA 262-263).  Of these employees, twenty-four (24) were African-Americans.  This is 68%, which is almost exactly the percentage of African-Americans in OLC prior to the RIF.

While Plaintiff and several other African-American employees were offered employment in lower pay bands, white employees in the higher pay bands received identical treatment.[7]   In fact, Dwight Hayes, a white employee impacted by the OLC layoff, was not offered a job and retired.  Further, there were only twelve (12) employees at Band 5 and above.  No statistical conclusions can be drawn from a group of that size.

---

[7] Although the laid off employees, both African-American and Caucasian, Pay Grade 5 or above, were offered jobs at reduced salaries, they retained their state seniority benefits and retirement.  They also remained eligible within the state system for movement into other positions as they came open.  In this regard, they were much more fortunate than white employees Dwight Hayes and Randy Bryant, who retired because there was no longer a place in the Agency for them.

31

Further, and very significantly, Plaintiff has not analyzed these numbers in any way. Statistics must be measured or compared against *something* in order to be significant. *E.g., Henson v. Liggett Group, Inc.*, 61 F.3d 270 (4th Cir. 1995). All Plaintiff has shown is that there were many African-Americans in OLC impacted by the layoff, but that almost all of them went to new employment within the Agency. While OLC employees were rehired into OBS, they remained in the Agency. If the RIF was a subterfuge to reduce the number of African-Americans at LLR, it was a complete failure.[8]

**4. Allegations Regarding Non-Minority Employees:** Plaintiff argues that there were "less qualified white employees that were subject to the RIF plan, but were able to benefit from it, including Kate Nedovic, Dottie Buchanan, Janet Baumberger, Robbie Boland, Kathy Burgess, and Connie Flannery." This statement would lead one to believe that white employees were treated better as a result of the RIF than African-American employees. This is simply a mischaracterization of the record.

The source for this statement is the deposition testimony of employee Sherry Wilson and Plaintiff. Wilson admits that her information regarding the placement

---

[8] Plaintiff argues that he alleged a disparate impact claim which was "ignored in error." To the extent Plaintiff properly alleged a disparate impact claim in his complaint, which is denied, the claim has been waived. The Magistrate Judge granted summary judgment in the entire case. The Plaintiff's Objections did not take exception to the dismissal of any disparate impact claims. (JA 150-183). *Diamond v. Colonial Life & Accident Ins., Co.*, 416 F.3d 310 (4th Cir. 2005).

of these individuals is based on office gossip. (JA 1149; JA 1154). In his deposition, Plaintiff said he based his information on a website which reported state salaries. (JA 625). In fact, one of the "less qualified white employees" of whom Plaintiff complains benefitted from the RIF, Dottie Buchanan, was not even employed in OLC at the time of the RIF. (JA 260-261).

Janet Baumberger was RIFed along with the rest of OLC. She accepted a new position in OBS working with the Contractors Board effective April 1, 2011. (JA 283; JA 286). She later applied for, and received, a job as the Administrator of the Residential Builders Commission. (JA 548). Plaintiff did not apply for this job.

Boland was RIFed like Plaintiff and the remainder of OLC. Effective April 1, 2011, his salary dropped from a Band 6 to a Band 4, which meant a reduction from $52,015 annually to $31,843 annually. (JA 400-407). Boland then applied for a posted position as an Administrator of the Residential Builders Commission but the job was awarded to another applicant. (JA 400-407). He was promoted, effective May 17, 2011, to a Band 6 position at his previous salary and was assigned the task of planning Board and Commission applications "on line." (JA 400-407).

Nedovic, Burgess, and Flannery, who are white, were terminated and lost their jobs as of the date of the layoff in April 2011. They were only employed

33

months later when they applied for posted open positions. Flannery and Burgess were hired in late September 2011 and Nedovic was not hired until January of 2012. (JA 411-425).

**5. Ron Cook:** Plaintiff's only direct allegations of "racism" are focused on Defendant Cook. (JA 618).

Plaintiff makes reference to Defendant Cook's circulating a "racist" video about President Obama. Defendant Cook mistakenly forwarded a video about President Obama to the entire Agency. (JA 748; JA 902-903). A copy of the video is in the record. While the video has been characterized as "racist," an examination of the video reveals that it is a political satire directed towards President Obama. Defendant Cook was suspended by Director Youmans for misuse of the State computer system. (JA 748-749; JA 903; JA 1210).

It is also alleged that Defendant Cook used the "n" word in a conversation with Dwight Hayes referring to another LLR employee. Defendant Cook denies this and Hayes has no memory of it. (JA 746-747; JA 765).

Defendant Cook testified that he had nothing to do with the decisions to conduct a RIF of OLC. (JA 751). His interaction with Defendant Templeton was very limited and consisted of several specific encounters on topics unrelated to the subject of this lawsuit. (JA 733-734). Defendant Templeton was even clearer when asked if Defendant Ron Cook participated in the decision, she stated:

> Q:    Did Ron Cook ever have any conversations with you, provide you any input or influence to reorganize OLC or get rid of any black people at LLR?
>
> A:    I didn't consult with Mr. Cook on personnel matters.

(JA 1084).  This makes perfect sense because Defendant Cook never worked in OLC or OBS and was not promoted to an Assistant Deputy Director position until after the RIF was approved.  Assuming, for the sake of argument, that Defendant Cook enjoyed "stirring the pot" around the workplace and made racially charged comments while doing so, he was totally disconnected from the events complained of in this case.

Comments by co-workers cannot be construed as evidence of discrimination, regardless of what was said, if they are not made by the person making the contested employment decision.  *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 608 (4th Cir. 1999); *See also O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 549 (4th Cir. 1995) (there must be some nexus between the alleged discriminatory statements and the employer's employment decisions), *reversed on other grounds*, 517 U.S. 308 (1996); *Figures v. Board of Pub. Utils.*, 967 F.2d 357, 360-61 (10th Cir. 1992) (noting that racial comments are not probative of discrimination unless they are linked to the challenged action); *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438-39 (9th Cir. 1990) (holding that certain statements unconnected to the

employment decision-making process are simply stray remarks that do not demonstrate discriminatory intent).  *See Hill v. Lockheed Martin*, 354 F.3d at 297-98, (upholding summary judgment where Plaintiff could not demonstrate any relevant decision-maker harbored discriminatory motivation); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) ("Nor can statements by nondecisionmakers . . . suffice to satisfy plaintiff's burden" of proving discrimination.)   Accordingly, Cook's comments are not relevant to Plaintiff's claim.

**6. Miscellaneous Allegations:**

**(a).  Templeton's Visit to State Officials:**  Plaintiff attempts to attach some sinister motive to the fact that Defendant Templeton, as the newly appointed Director of the State Agency, met with the Governor, members of the Governor's Transition Team, and key State Legislators on the committees that supervise her agency.  (Appellant Brief at 26).  Such activities are so normal, routine and benign as not to raise any sort of inference that something evil was occurring.  She was simply doing her job.

**(b).  Rumor Reported by Bailey-Glover:** Plaintiff's statement regarding witness Roselind Bailey-Glover is indicative of the "evidence" he has asked the court to consider.  Plaintiff states:

> Bailey-Glover heard the 'n' word used in reference to
> Christian from people within the Agency, including one
> comment of '[w]ho does that 'n' word think he is.'

(Appellant Brief at 31).  In fact, Bailey-Glover stated she had not heard the "n" word

used in reference to Plaintiff from anyone directly.  She admitted that no one had

used the word with reference to Plaintiff in her presence and that she had never

reported the use of a racial slur to the Human Resource Department.  (JA 539-545).

Further, she did not recall hearing that phrase used by any individual, nor does she

know when or where she heard it.  In other words, the Bailey-Glover comment is

pure inadmissible hearsay and should not have even been cited as evidence in the

brief.

**(c).  Unsupported Opinions of Youmans:**  Adrienne Youmans was the

former Director of the Agency who left office as Director Templeton arrived.  She

is an African-American female.  (JA 1207-1208).  The formation of OLC was her

project and she freely admitted that a huge political battle developed over OLC.

(JA 1190-1193).  Her attempts to characterize this battle in terms of racism, as

cited in Plaintiff's brief, were based solely on her subjective feelings.  She could

cite to no facts supporting them.  (JA 1208-1209).

Youmans is quoted as stating that she believed that Representative Sandifer,

Chairman of the Labor, Commerce & Industry Committee, was the "biggest racist

that ever walked the state … halls of South Carolina."  (Appellant Brief at 8).  (JA

1203.)    However, she had absolutely no factual basis for that statement. Representative Sandifer was deposed at length and revealed nothing but legitimate concern for the function of OLC as expressed by the regulated public.  (JA 925-929; JA 934-936).

**(d).   The "Anonymous" Letter:**   Sometime in the summer of 2010, an anonymous letter was sent to several South Carolina Senators and Representatives, as well as the South Carolina Legislative Audit Council.  The author of the letter remained anonymous until Janet Baumberger was deposed on November 12, 2013. The "anonymous letter" consisted of a four-page, single-spaced attack on OLC and Plaintiff's management of it.  Baumberger identified the letter and stated that she wrote it with LLR employee Tracy Gunter.  (JA 552-553).

Baumberger had a previous history with Plaintiff.   She previously complained to Human Resources Director Lynn Rivers that Plaintiff had sexually harassed her.  (JA 551).  She did not file a formal complaint because she knew Plaintiff was very close to Director Adrienne Youmans and she was afraid she would be retaliated against.  (JA 551).  She then applied for a job in another area and was transferred.  (JA 551).  Baumberger testified that, other than her husband and Gunter, no one knew she wrote the letter.  (JA 556-557).

Former Director Youmans felt that allegations in the once "anonymous" letter were proof of "racist attacks" that were taking place against Plaintiff.

(Appellant Brief at 7). Youmans was unable to point to any part of the letter that referenced Plaintiff or anyone else's race. She felt subjectively that it was racist because it criticized Plaintiff's pay raise and the job performance of several African-Americans. (JA 1237-1240). Plaintiff also agreed that the letter contained no reference to his race. (JA 665). Further, the author of the letter, Janet Baumberger, was deposed and provided absolutely no evidence of racial motivation. (JA 553-554).

While the "anonymous letter" has been mentioned throughout the course of this litigation as part of the "conspiracy" to "get" Plaintiff, it turns out that it was written by two Administrative Assistants acting anonymously out of concern for the Agency and fear of retaliation.

### C. Plaintiff's Failure to Promote Claim

Defendant LLR has proffered legitimate, non-discriminatory reasons for promoting other candidates to the positions Plaintiff sought. The Department declined to promote Plaintiff because it believed other candidates were better qualified for the open positions. Failing to hire or promote an individual because other candidates were better qualified is a legitimate, non-discriminatory reason for an employer's decision. *See e.g. Hux v. City of Newport News,* 451 F.3d 311, 314 (4th Cir. 2006); *Lamb v. Boeing Co.,* 213 Fed. Appx. 180, 175 (4th Cir. 2007) (unpublished) (quoting *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d

954, 960 (4th Cir. 1996)) ("[R]elative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision.") *See also Ware v. Potter,* 106 Fed. Appx. 829 (4th Cir. 2004) (unpublished) (holding that the employer articulated a legitimate non-discriminatory reason for failing to promote the plaintiff - the successful candidates were more qualified for the positions at issue). Accordingly, Plaintiff must demonstrate that the decision-makers did not "honestly believe[]" that he was better qualified for the position. *Ware v. Potter*, 106 Fed. Appx. 829.

Plaintiff's own opinions and conclusory allegations regarding his relative qualifications for the position do not have sufficient "probative force to reflect a genuine issue of material fact." *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988). Rather, "'[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." *Evans,* 80 F.3d at 960-61 (quoting *Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir. 1980)).

As noted above, Defendant Alvey and Rogers interviewed all candidates and ranked them on a numerical scale. Defendant Alvey is white. Rogers is African-American. Plaintiff was interviewed for all three positions. In the opinion of Alvey and Rogers, the other candidates were better suited for the positions. A review of their experience and qualifications showed that all candidates were suitable for the positions awarded.

Plaintiff presents no evidence that the legitimate, non-discriminatory reasons articulated by Defendant LLR were not its actual reasons for failing to promote him. He has made no allegations nor offered any proof that the decision-makers harbored racial animus. He has never, during the course of litigation, made any allegations regarding the existence of racially derogatory language, racial slurs, or incidents suggesting racial animus on the part of Defendant Alvey or Rogers. *Jiminez v. Mary Washington College*, 57 F.3d 369, 383 (4th Cir. 1995) ("The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment."), *cert. denied,* 516 U.S. 944 (1995); *Moore v. Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985) (plaintiff offered no evidence that even hinted at an improper motive on the part of the defendant).

Plaintiff has complained that the temporary placement of Defendant Ido, Dorman, and Defendant Cook into the jobs, while permanent incumbents were sought, amounts to "preselection." Evidence that the employer violated its own policies or even preselected the successful candidate is not sufficient evidence to support a finding of pretext. *Mackey v. Shalala,* 360 F.3d 463, 468-469 (4th Cir. 2004) (citing *Kennedy v. Landon*, 598 F.2d 337, 341 (4th Cir. 1979)).

Alvey and Rogers evaluated each interviewee in detail and set forth written reasons for their decisions. (JA 382-399). There is no evidence to indicate that either was motivated by race.

### D. The District Court Correctly Dismissed Plaintiff's Conspiracy Claims

### 1. Background

Plaintiff contends the individual Defendants conspired with each other, as well as Governor Haley, Representative William E. Sandifer, III, and many others, including multiple Board and Commission members and members of the General Assembly. (JA 709-712; 719-720). However, he conceded he had no direct evidence of a civil conspiracy with regard to his employment. (JA 705-711). Additionally, he can point to no defamatory or slanderous statements made by anyone about him. (JA 712).

Civil conspiracy consists of three elements: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, (3) which causes him special damages. *E.g., Vaught v. Waites*, 300 S.C. 201, 209, 387 S.E.2d 91, 95 (Ct. App. 1989). The 'essential consideration' in civil conspiracy 'is not whether lawful or unlawful acts or means are employed to further the conspiracy, but *whether the primary purpose or object of the combination is to injure the plaintiff.*' *Id. Lee v. Chesterfield General Hospital, Inc.,* 289 S.C. 6, 13, 344 S.E.2d 379, 383 (Ct. App. 1986) (emphasis added).

42

A civil conspiracy claim must be supported by facts separate and independent of the other causes of action in the complaint; a plaintiff may not simply incorporate allegations that support other causes of action to sustain a cause of action for civil conspiracy. *E.g.*, *Cricket Cove Ventures, LLC v. Gilland*, 390 S.C. 312, 324–25, 701 S.E.2d 39, 46 (Ct. App. 2010).

The District Court adopted the Magistrate Judge's Report and Recommendation, which set forth three reasons for dismissing the state law civil conspiracy claims:  (1) failure to allege facts separate from those alleged in the discrimination case; (2) failure to allege or show special damages; and (3) immunity for employment actions of public officials.  In addition, the District Court noted a fourth reason, the absence of a showing by plaintiff that the primary purpose of the alleged conspiracy was to injure him. [9]

### 2.  Plaintiff's Civil Conspiracy Claim is Based on the Same Facts as His Other Claims

A claim for civil conspiracy must allege additional facts in furtherance of a conspiracy rather than reallege other claims.  *E.g.*, *Todd v. South Carolina Farm Bureau Mut. Ins. Co.*, 278 S.E.2d 607, 611 (1981); *Cricket Cove Ventures, LLC* at 324-325.  "Where the particular acts charged as a conspiracy are the same as those

---

[9] Plaintiff argues on appeal that the issue of "purpose of the conspiracy" is "the only element addressed by the lower court in support of granting summary judgment." (Appellant Brief at 50). This is an inaccurate characterization.  The District Judge accepted the Magistrate Judge's recommendation in its entirety.

relied on as the tortious act or actionable wrong, plaintiff cannot recover damages for such act or wrong, and recover likewise on the conspiracy to do the act or wrong." *Kuznik v. Bees Ferry Assocs.*, 538 S.E.2d 15, 31 (Ct. App. 2000).

Plaintiff has alleged no facts in furtherance of a conspiracy other than to reallege the facts he has asserted to support his Title VII complaint. Plaintiff's Title VII case is based on the far-fetched notion of a sweeping conspiracy, involving dozens, to eliminate OLC in order to discriminate against him individually. In fact, rather than identify separate facts in his brief, he merely invites the Court to review the "circumstantial evidence" set forth in support of his Title VII claim. (Appellant Brief at 52).

### 3. Plaintiff Has Not Pled or Proven Special Damages

The District Court further correctly held that there was absolutely no evidence of special damages as required to prove a state claim for civil conspiracy. The Magistrate Judge found, and the District Judge adopted:

> If a plaintiff merely repeats the damages from another claim instead of specifically listing special damages as part of their civil conspiracy claim, their conspiracy claim should be dismissed.

(JA 107). This holding is consistent with South Carolina law. *Hackworth v. Greywood at Hammett, LLC*, 385 S.C. 110, 117, 682 S.E.2d 871 (Ct. App. 2009); *Vaught v. Waites,* 300 S.C. at 209, 387 S.E.2d at 95:

> Special damages are those elements of damages that are the natural, but not the necessary or usual, consequence of the defendant's conduct. General damages are inferred by the law itself, as they are the immediate, direct, and proximate result of the act complained of. Special damages, on the other hand, are not implied at law because they do not necessarily result from the wrong. Special damages must, therefore, be specifically alleged in the complaint to avoid surprise to the other party.

*Hackworth* at 116 (citations omitted).

Plaintiff alleges that the civil conspiracy caused the RIF and that he was damaged as a result. These are the same damages that have been alleged in his Title VII claim. There is nothing additional. Special damages have not been identified, either in the pleadings or in any subsequent brief, including the brief filed by Plaintiff in this Court.

On appeal, Plaintiff makes no argument on special damages other than to refer the Court to his Objections to the Report and Recommendations "to the extent special damages are an issue."[10] (Appellant Brief at 55, n. 15). However, a review of those pages reveals only conclusory statements about special damages. Plaintiff never tells us what those damages are. There are no actual damages alleged which would not be recoverable, if properly proven, under Title VII's damage provisions.

---

[10] This Court has noted that "arguments incorporated by reference need not be considered on appeal." *United States v. Bales*, 813 F.2d 1289, 1297 (4th Cir.1987); *accord, Cray Communications v. Novatel Computer Sys.*, 33 F.3d 390, 396, n. 6 (4th Cir. 1994) (incorporation of district court filings by reference is "a practice that has been consistently and roundly condemned by the Courts of Appeals").

45

Plaintiff's objections argued that punitive damages are "special" because they are not available against a government entity in a Title VII case. (JA 167). However, special damages are actual, not punitive, damages. *McNaughton v. Charleston Charter School for Math and Science, Inc.*, 768 S.E.2d 389 (2015).

### 4. The Individual Defendants' Actions Were Taken in the Scope of Their Official Duties, Which Rendered Those Defendants Statutorily Immune From Suit

The individual Defendants have immunity from a civil conspiracy claim. The South Carolina General Assembly approved a proviso to the State Budget providing government employees' statutory immunity in civil conspiracy claims arising from employment actions. *See* S.C. 2014-2015 Appropriation Bill, Act No. 286, H. 4701, Proviso 117.92 (eff. July 1, 2014). This proviso has appeared in every budget since the 2010-2011 budget year. *See* S.C. Appropriations Act, Proviso 89.146 (2010-11); Proviso 89.118 (2011-12); Proviso 89.103 (2012-13). This proviso relates to civil conspiracy claims based upon personnel or employment actions against state or local government employees. Specifically, it states "if the court finds the government employee was acting within the scope of their official duties, the employee is immune from suit, liability, and damages with respect to the civil conspiracy claim." See Proviso 117.95.

Each of Plaintiff's allegations arise out of his employment at LLR. He has not presented any evidence that a Defendant acted outside the scope of his

or her employment with regard to the employment actions taken. Other than generalized allegations, Plaintiff has utterly failed to show the existence of any personal motives, which would indicate the Defendants were acting outside of their official duties.

Plaintiff's attempts to identify the personal motivation of each individual Defendant never rise beyond the proffer of conclusory allegations. For example, Plaintiff asserts first that Defendant Templeton had a "personal vendetta" against him (Appellant Brief at 54) but cites absolutely nothing that supports that statement. The Plaintiff points to communications between Templeton and the Chairman of the Labor, Commerce and Industry Committee, chairmen of various Boards, agency employees, and the outgoing Director in an attempt to buttress his allegations of a "personal vendetta." However, Plaintiff's speculation is completely unsubstantiated. Defendant Templeton was the new Director of the Agency. Her actions, in assessing the problems at OLC, determining how to reorganize OLC, and implementing the reorganization were all completely within the scope of her authority and responsibility as Director of the Agency. She was simply doing her job.

In discussing Defendant Alvey (Appellant Brief at 54-55), Plaintiff cites no personal motivation at all. Alvey was a new Deputy Director. As such, he was acting in his role as an administrator of the POL Division when he carried out

Defendant Templeton's decisions resulting from the reorganization. Implementing the many RIFs which reorganized the Agency were part of his job, as was selecting employees for open positions. Plaintiff has not asserted or proven that either Defendant Templeton or Defendant Alvey had anything to gain by harming Plaintiff or had any animus toward Plaintiff personally.[11]

Likewise, no personal motivation is cited at all in connection with Defendant Wilkins. (Appellant Brief at 55). It is difficult, if not impossible, to see why Defendant Wilkins, the Director of the statewide Office of Human Resources, would have had any reason to entertain a personal animus against Plaintiff, a midlevel manager at one of the many agencies whose personnel policies were overseen by Defendant Wilkins' agency.

Defendant Wilkins was acting within his role as a Human Resource consultant to state agencies. He had nothing to do with this case other than to meet with Defendant Templeton and advise her regarding the appropriate state

---

[11] In fact, Defendant Alvey testified, without subsequent contradiction from Plaintiff, that in the course of another deposition, Plaintiff called Defendant Alvey aside to a conference room, and began a conversation with him. During that conversation, Plaintiff told Defendant Alvey that:

> . . .he knew that we hadn't done anything or I [Alvey] hadn't done anything. [Christian] did say, "I just wish you had done more to help [me]." And I did tell him that I tried to help you, I did everything I could do.

(JA 513). This testimony is uncontradicted and constitutes an admission by Plaintiff that Alvey had done nothing wrong.

procedures to follow in implementing a RIF.  This is hardly surprising since Defendant Templeton had never worked for state government before and wanted to make sure that everything was done properly.

In speaking with incoming cabinet officials – including Defendant Templeton – about personnel matters, Defendant Wilkins did absolutely nothing outside the scope of his duty.  In fact, this is *exactly* what Defendant Wilkins, as State Human Resource Director, is supposed to do.  It is incontrovertible that Defendant Wilkins' official duty includes advising state agencies concerning personnel matters.  S.C. Code Ann. § 8-11-230.  Plaintiff acknowledged that giving such advice was actually part of Defendant Wilkins' duties as the State Human Resource Director.  (JA 640).

Plaintiff has no evidence that any communication between Defendant Wilkins, Pope, Defendant Templeton, or any other member of LLR was "*ex parte*" or in any way outside the scope of his or her respective duty.  (JA 653-654).  In fact, Plaintiff admitted that he has no information that Defendant Wilkins did anything other than offer advice and consult with LLR as required by his job.  (JA 640).  Plaintiff also admitted to having no knowledge of the content of the discussions between Defendant Wilkins or his assistants with anyone at LLR.  (JA 642).

No personal motivation is cited in connection with Defendants Cook and Ido. Neither participated in the decisions complained of. (Appellant Brief at 55-56). The Plaintiff tacitly admits as much regarding Defendant Ido in his brief, as the Plaintiff asserted only that Defendant Ido "benefited from" the purported conspiracy amongst the individual defendants to injure him and that Defendant Ido "was ultimately awarded the [OBS job] over" him, despite the Plaintiff's unsubstantiated claim that he was "better qualified" than Defendant Ido. (Appellant Brief at 56).[12]

### 5. Plaintiff Has Not Shown That the Primary Purpose of the OLC RIF Was To Injure Him

The District Court correctly held that Plaintiff has not shown that the "primary purpose" of any alleged conspiracy was to injure him. Under South Carolina law, a plaintiff is required to show that "[t]he *essential consideration* in civil conspiracy is . . . whether the *primary purpose or object of the combination is to injure the plaintiff." See Inheritance Funding Co. v. Chatman*, 2013 WL 3946237, 5, citing *Pye v. Estate of Fox*, 369 S.C. 555, 567, 633 S.E.2d 505, 511 (2006). As noted above at great length, there is no question that a significant dispute existed regarding the effectiveness of OLC and the need for reorganization

---

[12] During his deposition, counsel for the various Defendants reviewed with Christian his list of purported conspirators no less than three (3) times. (JA 610-613; JA 637-639; JA 705-709). Christian, at no point during his deposition, identified Ido amongst the list of purported conspirators. (*Id.*)

50

within LLR.  Regardless of any negative impact on Christian, there is no evidence supporting the proposition that the primary purpose of the activities of Defendants Templeton, Alvey, and Wilkins was to harm Christian rather than to reorganize the functions of OLC.  Defendants Cook and Ido were not involved in the reorganization process at all.  For this reason, the District court correctly determined that the Plaintiff failed to produce evidence establishing this essential part of a civil conspiracy claim.

## V. **CONCLUSION**

For the foregoing reasons, Appellees respectfully submit that the order and judgment below should be affirmed.

Respectfully submitted,

FISHER & PHILLIPS LLP

Jonathan P. Pearson (Fed. I.D. #3027)
jpearson@laborlawyers.com

Fisher & Phillips LLP
Post Office Box 11612
Columbia, South Carolina 29211
(803) 255-0000
*Counsel for Defendant-Appellee South Carolina Department of Labor,*
  *Licensing and Regulation*

Kenneth P. Woodington (Fed. #4741)
Daniel C. Plyler (Fed. #9762)
Davidson & Lindemann, P.A.
PO Box 8568
Columbia, SC 29202-8568
(803) 806-8222
kwoodington@dml-law.com
dplyler@dml-law.com
*Counsel for Defendant-Appellee Holbrook Alvey*

Eugene H. Matthews (Fed. #7141)
Richardson Plowden & Robinson, P.A.
PO Box 7788
Columbia, SC  29202
(803) 771-0016
gmatthews@RichardsonPlowden.com
*Counsel for Defendant-Appellee Samuel Wilkins*

Damon C. Wlodarczyk (Fed. #9487)
Riley Pope & Laney, LLC
P.O. Box 11412
Columbia, SC  29211
(803) 799-9993
damonw@rplfirm.com
*Counsel for Defendant-Appellee William Cook, a/k/a Ron*

Katherine Anne Phillips (Fed. # 10381)
Malone, Thompson, Summers & Ott, LLC
339 Heyward Street, Suite 200
Columbia, SC  29201
(803) 254-3300
phillips@mtsolawfirm.com
*Counsel for Defendant-Appellee Charles Ido*

Mary Agnes (Molly) Hood Craig (Fed. #6671)
Brian Edward Johnson (Fed. # 10098)
Hood Law Firm
PO Box 1508
Charleston, SC  29402-1508
(843) 577-4435
Molly.craig@hoodlaw.com
Brian.johnson@hoodlaw.com
*Counsel for Defendant-Appellee Catherine Templeton*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>
**Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>11,234</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.


May 4, 2015                                         /s/ Jonathan P. Pearson
                                                   Jonathan P. Pearson

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on May 4, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Karen R. Taylor
Karen R. Taylor
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219